UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ROBERT JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:11-cv-642 |
| ) | |
| WATERBURY POLICE DEPARTMENT, ) | |
| OFFICER LAWRENCE SMITH, and ) | |
| OFFICER TIMOTHY KLUNTZ, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER RE:
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
CHARLES MITCHELL'S MOTION TO JOIN AS CO-PLAINTIFF, AND
PLAINTIFF'S MOTION TO AMEND CAPTION TO ADD NEW DEFENDANTS
(Docs. 46, 48 & 50)**

Plaintiff Robert Jackson sues the Waterbury Police Department (WPD) and two of its officers for allegedly violating his Fourth Amendment rights during two separate incidents in 2009. Jackson represents himself in this action. Currently before the court are defendants' motion for summary judgment (Doc. 46), a motion to intervene filed by Charles Mitchell, who was present at one of the incidents (Doc. 48), and Jackson's motion to amend his complaint (Doc. 50). The court addresses each motion in turn.

### I.   Facts

The following facts are drawn from the parties' statements of facts and are undisputed except where noted.

#### A.   November 5, 2009 Incident

In late 2009, defendants Lawrence Smith and Timothy Kluntz were police officers with the WPD in Waterbury, Connecticut. Smith held the rank of lieutenant and Kluntz held the rank of sergeant. Both were members of the Vice and Intelligence Division of the WPD.

1

On November 5, 2009 at approximately 1:00 p.m., Lieutenant Smith and Sergeant Kluntz, along with WPD detectives Thomas Cavanaugh, Richard Iannaimo, and Jason Lanoie, were on patrol in unmarked police vehicles in the area of Irvington Avenue and Bunker Hill Avenue. According to the officers, that area was a location of numerous narcotics investigations and arrests at the time. For his part, Jackson describes the area as "a low crime[,] predomina[nt]ly white, middle class neighborhood." (Doc. 60-2 at 1.)

Detectives Cavanaugh, Iannaimo and Lanoie and Lieutenant Smith were in one vehicle. While driving east on Irvington Avenue, Cavanaugh, Lanoie and Iannaimo observed a tan Buick Century traveling west on Irvington.

According to an affidavit filed by Detective Cavanaugh, the officers observed that the driver of the Buick, Charles Mitchell, was not wearing his seatbelt. (Doc. 46-3 at 15.) The driver then turned right into the driveway of 114 Irvington Avenue and parked the car. Shirley Benton, who was riding in the front passenger seat, exited the Buick. The officers saw her drop something from her hand to the ground.

The officers "performed a motor vehicle stop" in the driveway, exited their vehicle, and approached Benton. (Doc. 46-3 at 15.) Detective Cavanaugh recovered the item Benton had dropped, which was a cigar paper containing marijuana. He placed Benton under arrest for possession of marijuana. A search of Benton's person revealed a glass pipe with burnt residue on it in Benton's front right coat pocket. Cavanaugh suspected that the pipe was used to smoke crack cocaine, and seized the pipe. Benton later pleaded guilty to a criminal charge of possession of marijuana. (Doc. 46-2 at 7.)

Detective Iannaimo proceeded to search the Buick and found Jackson slouched in the back seat with his chin resting on his chest. (Doc. 46-5 at 27.) Jackson was ordered to exit the vehicle and was placed in handcuffs. Detective Iannaimo knew that Jackson had been convicted of prior felony narcotics offenses and had "a pattern to run away from police." (Doc. 46-5 at 27.) Jackson denies that he had a "pattern" of running away, but admits that he fled from the police once before. (Doc. 60-2 at 21.) According to defendants, Jackson's outer clothing was patted down. No weapons were located. Defendants claim that Jackson's handcuffs were removed after they finished searching the Buick and found no contraband. Detective Iannaimo

checked Mitchell's license and learned that it was suspended. Mitchell was cited for driving with a suspended license and failure to wear a seatbelt.

Jackson tells a very different version of events. According to him and Mitchell, Benton was driving the Buick. (Doc. 60-3 at 2, 28.) Both deny that Benton dropped anything to the ground, or that Mitchell had a suspended license. (*Id.*) Jackson says that he was sitting upright in the backseat of the Buick and was "not fully awake and a lil droggy" when police ordered him out of the vehicle. (Doc. 60-3 at 2, 28.) Jackson claims that he, Mitchell, and Benton were placed in handcuffs. (Doc. 60-3 at 2.) Police proceeded to search the Buick and the other cars in the driveway. (*Id.*) Police found a piece of a marijuana cigarette in the ashtray of another parked car which they falsely claimed was dropped by Benton. (*Id.* at 2-3.) Police then took Jackson, Mitchell and Benton one by one into the living room of 114 Irvington Avenue where they were forced to remove all of their clothes, bend over, squat and expose their genitals to police. (*Id.* at 28.) The police officers then searched the house without a warrant. (*Id.*) The incident lasted over an hour. (*Id.*)

Defendants deny that a strip search occurred on November 5, 2009, or that they searched the house at 114 Irvington Avenue. (Doc. 46-2 at 7.)

**B.    December 10, 2009 Incident**

On December 10, 2009, Lieutenant Smith, Sergeant Kluntz, and Detective Cavanaugh along with Sergeant Adrian Acosta, Officer Eric Medina and Officer William Weidemeir of the WPD went to 972 West Main Street in Waterbury to execute a search warrant. The warrant permitted officers to enter "972 West Main Street, Apt. 1, south side," and to search the premises for cocaine, money, drug paraphernalia, weapons, and other related items. (Doc. 46-4 at 7.) Police believed that the premises were being used to deal cocaine. (*Id.* at 9.)

While approaching Apartment 1, south side, the officers observed two black males exiting the apartment by shutting the door behind them. (Doc. 46-4 at 3.) The men ran across the hallway into Apartment 1, north side. (*Id.*) The officers yelled at the males to stop, stating that they were police with a search warrant. (*Id.*)

3

One of the men, who was later identified as Barry Pringle, ran toward the back of the apartment. Officer Medina caught up to him as he was attempting to stuff an item into his right front sock. Officer Medina handcuffed Pringle and retrieved the item from Pringle's sock. It turned out to be a clear plastic bag containing crack cocaine. Medina also found $666 in cash and a set of keys on Pringle's person. (*Id.*)

According to the officers, the other man, who was later identified as Jackson, ran into the front room of the apartment and shut the door behind him. A woman later identified as Elena Melendez attempted to hold the door shut against the police while Jackson jumped out the window. Officers saw Jackson discarding items from his pockets. Officer Weidemeir and Lieutenant Smith detained Jackson and picked up the items he tossed to the ground. These included a plastic bag containing many small zip-lock bags, which the officers knew were commonly used for packaging narcotics, and a set of keys. (*Id.*)

Other officers knocked on the door of Apartment 1, south side and announced their presence. No one responded. They forced their way in and found that nobody was in the apartment. The officers found PCP and marijuana in the apartment. (*Id.* at 3-4.) The officers checked the keys found on Pringle and Jackson and found that both had a key that unlocked the door to Apartment 1, south side. Both men were arrested and charged with interfering with a search warrant, felony possession of marijuana, and other offenses. (*Id.* at 4-5.)

Jackson was taken to the WPD. Lieutenant Smith authorized Officer Medina to conduct a strip search of Jackson. (Doc. 46-4 at 21.) Jackson was taken to the men's bathroom, where his pants, shirt, shoes, socks and undershirt were removed. His undershorts were not removed or re-arranged. (*Id.* at 22; Doc. 46-6 at 9.) He was apparently released after he was searched.

On the following day, December 11, police returned to Apartment 1, north side and arrested Jackson on unrelated drug charges. (Doc. 60-3 at 83.) On October 20, 2010, he pleaded guilty to possession of narcotics with intent to sell as a result of the December 11 arrest. (Doc.

46-2 at 15.) He was sentenced to five years' imprisonment and a nolle prosequi was entered on the charges arising from the December 10 incident.[1]  (*Id.*)

Jackson denies that he ever resided in or entered Apartment 1, south side or that he had a key for that apartment. (Doc. 60-3 at 62-63.) He claims that he was visiting his uncle John Knight in Apartment 1, north side on December 10, and was sitting in the front bedroom with Elena Melendez with the door locked when he heard shouting, became alarmed and jumped out the window. (*Id.*)

Jackson filed his complaint in Waterbury Superior Court in March 2011, alleging that defendants had violated his constitutional rights under the Connecticut Constitution and the Fourth and Fourteenth Amendments to the U.S. Constitution and seeking $15,000 in damages. (Doc. 1.) Defendants removed the action to this court pursuant to 28 U.S.C. §§ 1331 and 1441.

## II.    Defendants' Motion for Summary Judgment
### A.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.    Claims Against the WPD

Although it is nowhere stated in Jackson's complaint or opposition to summary judgment, the court construes this civil rights action to be brought under 42 U.S.C. § 1983, which allows individuals to seek redress against "persons" who violate their civil rights. A municipality is considered to be a "person" subject to suit under § 1983. *Monell v. Dep't of Soc.*

---

[1] "A nolle prosequi is a unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy. Under Connecticut law, a nolle prosequi terminates the prosecution, but the prosecuting authority is permitted to initiate a new action against the defendant within the statute of limitations. A nolle prosequi may not be entered if the accused objects and demands either a trial or dismissal. Criminal charges that have been nolled are erased thirteen months after entry of the nolle prosequi." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quotation and citations omitted).

5

*Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). A municipal police department, however, is neither a municipality nor a "person" that can be sued under § 1983. *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 164 (D. Conn. 2005) (dismissing claims against WPD because it was not independent legal entity that was subject to suit under § 1983). Defendants' motion for summary judgment on the claims against the WPD is therefore GRANTED.

    **C.**    **Claims Arising from Events of November 5, 2009**
        **i.**    **Seizure and Search of Jackson's Person**

Defendants argue that Jackson was not unlawfully seized and searched during the police investigation at 114 Irvington Avenue. They contend that they were justified in stopping Mitchell's Buick because they observed that Mitchell was not wearing his seatbelt while operating the vehicle. Thus, they claim, it was permissible to order Jackson out of the car, place him in handcuffs, and pat him down for weapons in order to ensure their safety. Further, they argue that they had probable cause to search the car for contraband once they saw Benton drop marijuana on the ground. They deny that Jackson was strip searched.

Jackson argues that the stop was unjustified from the outset. Both he and Mitchell claim that Benton, not Mitchell, was driving Mitchell's car. (Doc. 60-3 at 2, 28.) He claims that defendants' asserted justification for the stop—that Mitchell, the operator, was not wearing his seatbelt—is false and that the stop was unlawful. He claims that it was unreasonable for the officers to order him out of the car, handcuff him, pat him down and empty his pockets. He further alleges that he was forced to undergo a humiliating strip search.

The Fourth Amendment permits police to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The stop must be supported by "some minimal level of objective justification." *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984). The officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient. *Terry*, 392 U.S. at 27.

Under Connecticut law, both the operator and the front seat passenger in a vehicle must wear a safety belt while the vehicle is being operated. Conn. Gen. Stat. § 14-100a(c). Jackson

6

and Mitchell deny that Mitchell was operating the vehicle and claim that he was in the passenger seat. (Doc. 60-2 ¶ 8.) They do not claim that he was wearing his safety belt. Thus, even if the officers were mistaken about who was driving the car, their observation that Mitchell was not wearing a safety belt was a sufficient reason to conduct an investigatory stop. They were also justified in ordering Jackson out of the Buick. A police officer may, as a matter of course, order a passenger of a lawfully stopped car to exit the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997).

From there on, however, the reasonableness of the officers' actions is genuinely disputed. Defendants contend that they patted down Jackson's outer clothing. (Doc. 46-5 at 22, 28.) Jackson claims that the officers did not just pat him down for weapons, but reached into and emptied his pockets. (Doc. 60-3 at 2.) A police officer conducting an investigatory stop may perform a limited pat down of an individual to check for weapons if he has reason to believe that the individual may be armed. *Terry*, 392 U.S. at 27. However, a warrantless search of an individual's pockets is *per se* unreasonable under the Fourth Amendment unless it falls within one of several exceptions, none of which have been shown by defendants to apply here. *United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002). Accepting Jackson's version of events as true, he had not been lawfully arrested when the officers frisked him, and the search of his pockets violated his rights under the Fourth Amendment.

Jackson also claims that the stop became a *de facto* arrest unsupported by probable cause when officers handcuffed him and held him for a prolonged period of time while they conducted a warrantless search of the vehicles and his house. An investigatory stop may ripen into an arrest if "the officers unreasonably used means of detention that were more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993). Determining whether an arrest occurred requires an assessment of all of the circumstances, including:

> [T]he amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

7

*Id.* at 645 (citations omitted). Here, Jackson claims that he was detained in handcuffs for over an hour and subjected to a strip search. These allegations could lead a jury to conclude that he was falsely arrested in violation of his Fourth Amendment rights.

It is also genuinely disputed whether Jackson and the others were strip searched on November 5, 2009. Under the Fourth Amendment and Connecticut law, police may not conduct a strip search of a person arrested for a motor vehicle violation or a misdemeanor unless they have a reasonable suspicion that the individual is concealing a weapon, a controlled substance or contraband. *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986); Conn. Gen. Stat. §54-33*l*(a). A search must be authorized in writing by a superior officer. Conn Gen. Stat. § 54-33*l*(d). Defendants deny that any strip search occurred. However, on a motion for summary judgment, the court is required to accept the non-moving party's version of events. Were a jury to believe Jackson's allegations regarding the strip search, they could find that the officers violated his rights under the Fourth Amendment and Connecticut law.

Because the underlying facts surrounding Jackson's search and seizure claims are disputed, the court also cannot determine at this time whether defendants are entitled to qualified immunity for their alleged actions. For these reasons, summary judgment is DENIED on these claims.

### ii. Search of Mitchell's Vehicle and Other Vehicles at 114 Irvington Avenue

Jackson alleges that his Fourth Amendment rights were violated when police officers searched Mitchell's Buick in the driveway of 114 Irvington Avenue.

A party claiming that his Fourth Amendment rights were violated by a vehicle search "must show that he had an expectation of privacy in the invaded place and that the expectation was legitimate, one that society is prepared to recognize as reasonable." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). Jackson has not shown that he had any property or possessory interest in Mitchell's Buick or the other vehicles that were allegedly searched which would give rise to a legitimate expectation of privacy in those spaces. *See Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (holding that passengers who asserted neither property nor possessory interest in vehicle had no legitimate expectation of privacy in areas of automobile that were searched);

8

*United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988) (same). He has therefore failed to establish that his Fourth Amendment rights were violated by the search of Mitchell's Buick.

Jackson's argument that he had a legitimate expectation of privacy in the driveway of 114 Irvington Avenue likewise fails. "[A]reas such as driveways that are readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988). The Second Circuit has held that the Fourth Amendment is not violated by law enforcement officers' pursuit of legitimate police business on a privately owned driveway that is publicly visible and has no signs or barriers preventing entry. *United States v. Reyes*, 283 F.3d 446, 466-67 (2d Cir. 2002). Jackson has provided no evidence that the driveway at 114 Irvington Avenue contained signs or barriers prohibiting entry, or that the driveway was particularly secluded or was used for "activities of an intimate nature." *Id.* at 467. The police officers were in the driveway for legitimate police business, that is, to conduct a traffic stop. Jackson has failed to establish that the officers violated the Fourth Amendment by their presence in the driveway. Defendants' motion for summary judgment on this claim is GRANTED.

### iii.    Search of House at 114 Irvington Avenue

Jackson also claims that defendants violated his rights when they searched the house at 114 Irvington Avenue on November 5, 2009. Defendants deny that they searched the house. They argue that Jackson has no standing to assert a Fourth Amendment claim for the alleged search because it was owned by Jack Lawton. (Doc. 46-1 at 11.)

However, Jackson asserts in his affidavit that he was a tenant of Lawton's with a key to the house and a parking space. (Doc. 60-3 at 28.) He describes 114 Irvington Avenue as his "temporary residence" and his address in White Plains, New York as his "permanent residence." (Doc. 60-1 at 13.) It is well-settled that the Fourth Amendment protects a tenant against an unreasonable search of his residence. *Minnesota v. Carter*, 525 U.S. 83, 96 (1998); *see also Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (holding that an overnight guest in a home likewise shares legitimate expectation of privacy in the home). Accepting Jackson's characterization of his interest in the house at 114 Irvington Avenue as true for the purposes of

9

summary judgment, he has established a legitimate expectation of privacy in its contents. Defendants' motion for summary judgment on this claim is therefore DENIED.

### iv.   Personal Involvement of Sergeant Kluntz

Finally, defendants argue that Jackson cannot proffer any evidence to show that Sergeant Kluntz was personally involved in the events of November 5, 2009. The court finds this argument unpersuasive. It is undisputed that Sergeant Kluntz was present during the incident, and Jackson alleges in his affidavit that Kluntz was one of the officers who searched the house at 114 Irvington Avenue. (Doc. 60-3 at 29.) Assuming that a jury finds this allegation credible, it is sufficient to show that Kluntz was personally involved in an alleged violation of Jackson's Fourth Amendment rights.

### D.   Claims Arising from Events of December 10, 2009

Jackson seeks to hold defendants liable for their warrantless entry of Apartment 1, north side on December 10, 2009, which he claims violated his Fourth Amendment rights. He also asserts claims of false arrest and malicious prosecution arising from the officers' entry of that apartment and his ensuing arrest.

### i.   Whether Jackson Had a Legitimate Expectation of Privacy in Apartment 1, North Side

Defendants argue that Jackson has failed to show that he had a legitimate expectation of privacy in 972 West Main Street, Apartment 1, north side that would permit him to contest the officers' warrantless entry of that apartment on December 10, 2009.

As discussed above, the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). In *Olson*, the Supreme Court held that an overnight guest in a house had a legitimate expectation of privacy in his host's home. 495 U.S. at 98-99. The Second Circuit subsequently interpreted *Olson* to mean that "any guest, in appropriate circumstances, may have a legitimate expectation of privacy when he is there 'with the

10

permission of his host, who is willing to share his house and his privacy with his guest.'" *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) (quoting *Olson*, 495 U.S. at 99).

However, in *Carter*, 525 U.S. at 83, a case involving short-term guests, the Supreme Court rejected a similarly broad interpretation of the Fourth Amendment by Minnesota's high court. In *Carter*, the Court held that defendants who were present in another person's apartment for a short time for the purpose of bagging cocaine had no legitimate expectation of privacy in the apartment. The *Carter* Court noted that its statement in *Jones v. United States*, 362, U.S. 257, 267 (1960), that "anyone legitimately on premises where a search occurs may challenge its legality" had been expressly repudiated by *Rakas*, 439 U.S. at 128. *Carter*, 525 U.S. at 90. "Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* The *Carter* defendants were not overnight guests, and there was no evidence that they had a similar "degree of acceptance into the household" as overnight guests. *Id.* They "were essentially present for a business transaction and were only in the home a matter of hours," and thus had no legitimate expectation of privacy in the apartment. *Id.*

Like the defendant in *Carter*, Jackson has failed to establish that he had a legitimate expectation of privacy in Apartment 1, north side. Jackson asserts in his affidavit that he was "visiting" his uncle, John Knight at that address on December 10. (Doc. 60-3 at 62.) He does not allege that he had some property interest in the premises, was an overnight guest, or that he had a key to the apartment. In his affidavit, he states merely that he was visiting his uncle at the time and was sitting in the front bedroom with the door locked, speaking to Elena Melendez.[2] (Doc. 60-3 at 62.) He has not shown that he was more than just a visitor to the apartment. A person "who is merely present with the consent of the householder may not" challenge a warrantless entry of the premises. *Carter*, 525 U.S. at 90; *see also United States v. Brown*, 596

---

[2] Jackson states in his brief that he frequently visited his uncle and often spent nights there, but this statement is not supported by his affidavits or other evidence in the record. (Doc. 60-1 at 28.) While the court construes Jackson's submissions liberally because he is a *pro se* plaintiff, he must still comply with the usual requirements of Rule 56 and his "bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 365 (S.D.N.Y. 2011) (quotation omitted). Jackson obviously understands the requirement that factual statements be supported by affidavits or other materials in the record, as his other arguments are well supported by such evidence.

F. Supp. 2d 611, 629 (E.D.N.Y. 2009) (holding that invited guest engaged in social visit to another's apartment had no protected privacy interest in the apartment); *United States v. Cody*, 434 F. Supp. 2d 157, 166 (S.D.N.Y. 2006) (holding visitor to hotel room registered in another person's name had no legitimate expectation of privacy in room even though he claimed to be having affair in room with registered guest). Defendants' motion for summary judgment is GRANTED as to Jackson's claim that the warrantless entry of Apartment 1, north side violated his Fourth Amendment rights.

### ii.   Whether Jackson Has Established Favorable Termination for False Arrest and Malicious Prosecution Claims

Defendants argue that Jackson's false arrest and malicious prosecution claims fail because he cannot demonstrate that the proceedings arising from his arrest on December 10 terminated in his favor.

In analyzing a § 1983 claim for unconstitutional false arrest or malicious prosecution, the court looks to the law of the state where the arrest occurred. *Davis v. Rodriguez*, 364 F.3d 424, 433, 433 n.7 (2d Cir. 2004). Under Connecticut law, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Green v. Donroe*, 440 A.2d 973, 974 (Conn. 1982). Termination in favor of the plaintiff is an element of a § 1983 claim for false imprisonment or false arrest under Connecticut law.[3] *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992). Similarly, to prevail on a malicious prosecution claim under Connecticut law, "it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor." *Vandersluis v. Weil*, 407 A.2d 982, 985 (Conn. 1978).

Connecticut law does not require the plaintiff to show that there was "an adjudication on the merits in his favor or [to show] affirmatively that the circumstances of the termination indicated his innocence or nonliability, so long as the proceeding has terminated without consideration." *DeLaurentis v. City of New Haven*, 597 A.2d 807, 820 (Conn. 1991). Thus, Connecticut courts have generally determined "that a nolle prosequi satisfies the 'favorable

---

[3] Although the court observed in *Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) that "Connecticut law is less clearly settled" than New York law on the issue of whether a false arrest claim requires favorable termination, it subsequently stated that *Weyant*'s observation "in no way erodes the authority of *Roesch*." *Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011).

termination' element as long as the abandonment of the prosecution was not based on an arrangement with the defendant." *Roberts v. Babkiewicz*, 582 F.3d 418, 421 (2d Cir. 2009). However, an entry of nolle prosequi "will preclude a subsequent case for malicious prosecution where it was made as part of a plea bargain." *Holman v. Cascio*, 390 F. Supp. 2d 120, 123-24 (D. Conn. 2005) (discussing Connecticut cases).

Defendants claim that the charges arising from Jackson's arrest on December 10 were nolled as part of his agreement to plead guilty to one count of possession of narcotics arising from his arrest the following day. Jackson denies this, and claims that the entry of nolle prosequi "was due to a lack of credible evidence" on the part of the prosecution. (Doc. 60-2 at 7.) The record does not clearly establish whether the entry of nolle prosequi was part of Jackson's plea bargain or if the charges were dropped by the prosecutor unilaterally. The court simply stated "[o]pen counts, open files nolled," but did not explain why. (Doc. 46-6 at 24.) As the facts surrounding the nolle prosequi are disputed, the court cannot grant summary judgment to defendants on this basis. *See Haynes v. City of New London*, No. 3:99CV2551, 2002 WL 1204956, at *2 (D. Conn. May 17, 2002) (denying summary judgment on false arrest claim where circumstances surrounding nolle prosequi were disputed).

### iii. Whether Defendants Had Probable Cause to Arrest Jackson

Under Connecticut law, a claim for false arrest or malicious prosecution fails if the challenged arrest was supported by probable cause. *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citing Connecticut law); *see Vandersluis*, 407 A.2d at 985. Defendants assert that police had probable cause to arrest Jackson on December 10, dooming his false arrest and malicious prosecution claims.

For the purposes of summary judgment, the court accepts as true Jackson's statement that he was never in Apartment 1, south side, but was in fact sitting with Melendez in the front bedroom of Apartment 1, north side when police officers entered the apartment. However, this does not mean that the officers were without probable cause to arrest him in light of his subsequent conduct. *See Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) (holding that "fruit of the poisonous tree doctrine" did not provide causal link between unlawful stop of plaintiff's taxi and his subsequent arrest and conviction for possession of firearms and cocaine).

13

Jackson admits that he attempted to flee when he heard police arrive in Apartment 1, north side. After he jumped out the window of the front bedroom, officers saw Jackson discard items from his pockets including a bag full of zip-lock bags and a key.[4] The zip-lock bags were of a type commonly used in packaging narcotics. The key opened the door to Apartment 1, south side—the apartment subject to the search warrant. Jackson's evasive behavior, coupled with the fact that the officers were present in the building to execute a search warrant for evidence of drug dealing, was sufficiently suspicious to give them probable cause to arrest him. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *Sibron v. New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately fugitive actions and flight at the approach of strangers or law enforcement officers are strong indicia of mens rea and, when coupled with specific knowledge on the part of the officer relating the suspect to crime, they are proper factors to be considered in the decision to make an arrest.").

As the record shows that police had probable cause to arrest Jackson on December 10, defendants are entitled to summary judgment on his false arrest and malicious prosecution claims.

    iv.    **Strip Search on December 10**

After Jackson was arrested on felony narcotics charges on December 10, he was transported to police barracks where a strip search was conducted. The search was authorized in writing by Lieutenant Smith and was conducted in private by persons of the same sex as Jackson, in accordance with Connecticut law. Conn. Gen. Stat. §54-33*l*. There is no claim that the search was more invasive than permitted by law. Rather, Jackson argues that the search was illegal because his arrest was unlawful. As the court has already rejected Jackson's arguments that he was falsely arrested, this claim fails as well.

---

[4] In his statement of material facts, Jackson denies that he discarded items from his pockets while fleeing on the grounds that he was cleared of all charges by the nolle prosequi. However, the entry of nolle prosequi was not an adjudication of the merits in his favor. *Roberts*, 582 F.3d at 420. The fact that the charges arising from the December 10 incident were dropped does not establish that the police did not have probable cause to arrest Jackson in the first place.

Further, the evidence shows that the officers had reasonable suspicion to justify a strip search of Jackson. It is well-settled that an individual who is arrested for a misdemeanor may only be strip searched if police "have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986). This court agrees with other courts in the circuit which have concluded that the same standard applies to felony arrestees. *See, e.g., Sarnicola v. Cnty. of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002); *see also State v. Jenkins*, 842 A.2d 1148, 1156 (Conn. App. Ct. 2004) (adopting "reasonable suspicion" standard for strip searches incident to felony arrest). While Jackson attempted to flee, officers observed him throwing items out of his pockets onto the ground, including zip-lock bags which are commonly used to package narcotics and a key which unlocked the door to Apartment 1, south side. Police then found drugs and drug paraphernalia in that apartment. Under these circumstances, they were justified in suspecting that Jackson might be carrying more contraband in his clothes or on his person.

Defendants' motion for summary judgment is GRANTED with regard to Jackson's claim of unlawful strip search on December 10.

### III.   Charles Mitchell's Motion to Join as Co-Plaintiff

On December 10, 2014, Charles Mitchell filed a motion to intervene as a co-plaintiff. (Doc. 48.) He stated that he did not move to intervene at an earlier time because he had "recently located Jackson" and that "[i]t has taken more than a year to locate Jackson." (*Id.*) Mitchell filed a memorandum in support of his motion to intervene, arguing that he was unlawfully stopped by police, subjected to a strip search, and falsely arrested during the incident on November 5, 2009. (Doc. 57 at 6.) Mitchell argues that he is entitled to intervene under Federal Rules of Civil Procedure 24 and 20.

Under Rule 24(a), the court must allow a person to intervene "on timely motion" if he or she has an unconditional right to intervene under federal law, or if he or she "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a).

15

Mitchell has not demonstrated that he has an unconditional right to intervene under federal law. He argues that he has an interest in the property that is the subject of the action because he owned the Buick in which he, Jackson and Benton were traveling on November 5. (Doc. 57 at 9.) However, the ownership of the Buick is not the subject matter of this action. Nor has Mitchell otherwise shown that he has the right to intervene. This case will not affect his ability to protect his interest in holding defendants accountable for their alleged conduct on November 5, 2009. He remains free to bring a separate action (subject, of course, to statute of limitations defenses) and is not bound by what happens in this case. *See In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 199 (2d Cir. 2000) (denying motion to intervene as of right "because appellants remain free to file a separate action").

The court next considers whether permissive intervention is appropriate. Rule 24(b) states that the court may permit a person to intervene "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). The trial court's discretion in deciding whether to allow permissive intervention is "very broad." *United States Postal Serv. v. Brennan*, 579 F.2d 188, 192 (2d Cir. 1978).

A motion to intervene must be timely. Fed. R. Civ. P. 24(b). In determining whether a particular motion is timely, the court considers "(1) how long the applicant had notice of the interest before [he] made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001). "When the applicant appears to have been aware of the litigation but has delayed unduly seeking to intervene, courts generally have been reluctant to allow intervention." Charles Wright & Alan Miller et al., 7C Fed. Prac. & Proc. Civ. § 1916 (3d ed. 2015) (citing cases).

Jackson initiated this action in April 2011. (Doc. 1.) On March 21, 2012, Jackson filed a motion to join unnamed persons as co-plaintiffs because he had "recently re-established contact with the p[ro]spective co-plaintiffs whom are ready to litigate via attorneys, given the chance." (Doc. 24 at 1.) The motion was denied by Judge Haight because Jackson did not name or

16

describe the proposed co-plaintiffs, making it impossible for the court to determine whether the requirements for permissive joinder had been met. (Doc. 30.) Mitchell states in his memorandum that he and Benton were the proposed co-plaintiffs. (Doc. 57 at 1.) This indicates that Mitchell was aware of the litigation since at least March 2012. Yet he did not attempt to intervene until December 10, 2014—more than two years later. (Doc. 48.)

Allowing Mitchell to intervene at this late date will prejudice defendants. Discovery closed on September 3, 2014. (Doc. 45.) Defendants filed their motion for summary judgment on October 3, 2014. (Doc. 46.) The court's resolution of defendants' summary judgment motion means that this case is now ready for trial. Mitchell claims that if permitted to intervene, he will "adopt the facts of the original complaint, discovery and pleadings filed thus far by the Plaintiff and the Defendants so as not to delay litigation and make [it] unfairly expensive and burdensome on certain parties." (Doc. 57 at 5.) However, his additional claims would necessarily require some additional discovery by defendants as well as Mitchell. Adding Mitchell as a co-plaintiff will require discovery to be reopened so that defendants can investigate Mitchell's claims that he was unlawfully stopped by police, strip searched, and falsely arrested, thus prolonging this already lengthy litigation even further.

Further, as defendants argue, "[a] motion to intervene filed after the statute of limitations had run for the movant would not be timely." *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08 Civ. 5653, 2010 WL 6508190, at *1 (S.D.N.Y. Dec. 15, 2010). In a § 1983 action, the court applies the "most appropriate" or "most analogous" state statute of limitations, *Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994), which in this case is Connecticut's three-year statute of limitations for tort claims. *Id.*; Conn. Gen. Stat. § 52-577. Under federal law, a claim accrues for purposes of the statute of limitations "when the plaintiff knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). Mitchell's claims that he was unlawfully stopped and strip searched by police accrued on November 5, 2009, when those events allegedly occurred.[5] His motion to intervene was filed more than two years after the three-year statute of limitations expired for those claims.

---

[5] The court cannot determine on the record before it whether Mitchell's claim of false arrest also accrued on November 5, 2009. "If a favorable determination on the false arrest claim would in fact have undermined the validity of any potential conviction against [plaintiff] resulting from

17

Mitchell also moves to join as a co-plaintiff under Rule 20, which allows permissive joinder of parties whose claims arise out of the same facts. However, this rule is inapplicable to him because he is not a party to the litigation. *See* Bordeau, John, et al., 25 Fed. Proc., L. Ed. § 59:179 ("Intervention is used by a person who is outside the litigation who wishes to join it whereas permissive joinder is initiated by a person who is already a party to the proceeding who wishes to bring in another party.").

For these reasons, Mitchell's motion to intervene is DENIED.

### IV. Jackson's Motion to Amend His Complaint

After defendants filed their motion for summary judgment, Jackson filed a "Motion to Amend Caption." (Doc. 50 at 1.) He states that he wishes to add "[t]he additional names of Waterbury Police Officers." (*Id.*) The court interprets this as a motion to amend Jackson's complaint to add as defendants other police officers named in defendants' motion for summary judgment. Defendants have not opposed Jackson's motion. The court GRANTS IN PART Jackson's motion. He may amend his complaint to add the names of officers involved in the November 5, 2009 incident who are not already named defendants. Because Jackson's claims arising from the December 10, 2009 incident fail for reasons unrelated to the identity of the defendants, it would be futile to allow him to amend his complaint to add any officers who were involved in that incident.

---

the state criminal proceedings, then [plaintiff's] false arrest claim would not accrue until those criminal proceedings terminated." *Covington v. City of New York*, 171 F.3d 117, 119 (2d Cir. 1999). There is no evidence that the criminal proceedings arising from the events of November 5 terminated in Mitchell's favor, or when that would have occurred.

## V.     Conclusion

For the reasons stated above, defendants' motion for summary judgment (Doc. 46) is GRANTED with regard to all claims against the WPD and all claims arising from the events of December 10, 2009. Defendants' motion is DENIED with regard to Jackson's claims that officers falsely arrested him and unlawfully searched his house and his person on November 5, 2009.

Charles Mitchell's motion to join as co-plaintiff is DENIED. (Doc. 48.)

Jackson's motion to amend his complaint is GRANTED in part. (Doc. 50.) Within 30 days of this order, he may amend his complaint to add as defendants any additional officers he believes were involved in the November 5 incident.

Dated this ____ day of September, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court